**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

MAR 25 2016

JEFFREY P. ALLSTEADT, CLERK

| | | |
|---|---|---|
| IN RE: MARGARET ANN JOHNSSON | ) | |
| | ) | Chapter 7 |
| Pro Se Debtor and Party in Interest | ) | |
| | ) | Case No. 11-B-38307 |
| ———————————————— | ) | |
| | ) | Honorable Timothy A. Barnes |
| MARGARET ANN JOHNSSON | ) | |
| Plaintiff | ) | Adversary Proc. No. 16-A-_____ |
| v. | ) | |
| MARY THERESE JOHNSSON, | ) | |
| DONALD JOSEPH JOHNSSON, and | ) | |
| MICHAEL ROBERTS | ) | |
| Defendants | ) | |

## ADVERSARY COMPLAINT

The Pro Se Debtor and Party In Interest, Margaret Ann Johnsson, ("Pro Se Debtor-Party In Interest"), complains against Mary Therese Johnsson, against Donald Joseph Johnsson, and against Michael Roberts, attorney-at-law, and hereby states as follows.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. §1334(a)(b)(e) because this adversary proceeding arises in and relates to the Pro Se Debtor-Party In Interest's Chapter 7 case, Case No. 11 B 38307, which is pending in this Court, and also relates to Catherine L. Steege's Adversary Complaint #14-A-00106 which is also pending in this Court.

2.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(a) and (b)(2)(A)(E)(H) and (O).

3.     Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

1

## PARTIES

4.      Margaret Ann Johnsson is the Pro Se Debtor and Party In Interest in the above-captioned chapter 7 bankruptcy case and is the Pro Se Defendant in the above-referenced adversary complaint of Catherine L. Steege, both of which matters are pending before the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Honorable Timothy A. Barnes, presiding.

5.      John Cronin was the uncle of the Pro Se Debtor-Party In Interest, who died within 90 days of the filing of the Pro Se Debtor-Party In Interest's chapter 7 bankruptcy filing.

6.      Mary Therese Johnsson, ("M.T. Johnsson"), is the sister of the Pro Se Debtor-Party In Interest, who is concealing property of the bankruptcy estate and is concealing information related to the death of John Cronin which is harmfully interfering with the resolution of bankruptcy estate claims to any proceeds received and/or due to the Pro Se Debtor-Party In Interest's bankruptcy estate pursuant to the death of John Cronin.

7.      Donald Joseph Johnsson, ("D.J. Johnsson") is the brother of the Pro Se Debtor-Party In Interest, who is concealing information related to the death of John Cronin and is concealing information related to the actions of Mary Therese Johnsson which is harmfully interfering with the resolution of bankruptcy estate claims to any proceeds received and/or due to the Pro Se Debtor-Party In Interest's bankruptcy estate pursuant to the death of John Cronin.

8.      Michael Roberts ("Mr. Roberts"), is the attorney believed to have aided M.T. Johnsson in the concealing of assets and information related to the death of John Cronin.

9.      Catherine L. Steege ("Ms. Steege"), was appointed by the U.S. Trustee Office – Region 11 as the outsourced, private chapter 7 trustee of the Pro Se Debtor-Party In Interest's bankruptcy estate, and is also the Plaintiff in the related adversary complaint #14-A-00106.

## FACTUAL ALLEGATIONS

### John Cronin's Death And Resolution Of John Cronin's Post-Death Affairs

10.     On September 21, 2011, the Pro Se Debtor-Party In Interest, through the counsel she had hired solely for the purpose of completing her initial bankruptcy schedules filing, filed her chapter 7 bankruptcy petition.

11.     On December 16, 2011, M.T. Johnsson obtained entry to John Cronin's studio condominium at 1560 Sandburg Terrace, Chicago, Illinois and claimed to have found John Cronin in the bathtub, where he had allegedly been stuck for several days. M.T. Johnsson called an ambulance to remove John Cronin from his residence and take him to Northwestern Hospital.

12.     On the evening of December 16, 2011, M.T. Johnsson informed the Pro Se Debtor-Party In Interest and D.J. Johnsson that John Cronin was at Northwestern Hospital via voicemails.

13.     The Pro Se Debtor-Party In Interest and D.J. Johnsson both arrived at Northwestern Hospital on the evening of December 16, 2011 and were able to talk with John Cronin, who was in the Emergency Room at the time, and the two of them attempted to aid John Cronin in communicating with hospital staff about his wishes for his care. Once visiting hours were over in the Emergency Room, D.J. Johnsson spent the night sleeping in the waiting room of Northwestern Hospital so that he could be there to care for John Cronin.

14.     On December 17, 2011, the Pro Se Debtor-Party In Interest and M.T. Johnsson arrived at the hospital so that D.J. Johnsson could go home, take a shower and go to church and John Cronin would not be left alone. However, within a short time after D.J. Johnsson left the hospital, John Cronin died.

15.    M.T. Johnsson asked the Pro Se Debtor-Party In Interest what the next steps would be. The Pro Se Debtor-Party In Interest stated that John Cronin had asked the Pro Se Debtor-Party In Interest to be the executor of his estate, and that the first step would be to work on the funeral arrangements to make sure that things were taken care of before Christmas.

16.    The Pro Se Debtor-Party In Interest was unemployed, penniless, was in the midst of a highly contentious divorce proceeding, and had had to file for bankruptcy protection. D.J. Johnsson's net income is less than $20,000 per year. So the Pro Se Debtor-Party In Interest asked M.T. Johnsson if M.T. Johnsson would be able to pay for John Cronin's funeral arrangements, and then the estate could reimburse M.T. Johnsson, as the Pro Se Debtor-Party In Interest knew that John Cronin was planning to leave whatever money he had to D.J. Johnsson, although John Cronin had never disclosed to the Pro Se Debtor-Party In Interest how much money he had.

17.    M.T. Johnsson stated that she was not able to contribute any money to covering funeral costs, but that she (M.T. Johnsson) would go to John Cronin's studio condominium to "clean things up" before the Pro Se Debtor-Party In Interest went there "because there was blood and bowel movement all over the place" and the Pro Se Debtor-Party In Interest "would probably pass out if she saw the place."

18.    With no financial contribution, whatsoever, from the Pro Se Debtor-Party In Interest or from M.T. Johnsson, D.J. Johnsson paid for John Cronin's funeral from D.J. Johnsson's savings.

19.    John Cronin had never married and never fathered or adopted any children. The Pro Se Debtor-Party In Interest, M.T. Johnsson and D.J. Johnsson were considered the only heirs to John Cronin's estate, as John Cronin's brother, sister and parents had all died before he died.

20.      After the funeral for John Cronin, and after Christmas, the Pro Se Debtor-Party In

Interest went to John Cronin's studio condominium to obtain John Cronin's will and other

financial documents, so that she could begin the process of becoming the executor of his estate,

as John Cronin had verbally requested of her prior to his death. While most of studio

condominium was neat and orderly, with many of John Cronin's financial and other pertinent

records (such as his passport and expense receipts) readily accessible, the Pro Se Debtor-Party In

Interest was unable to find a copy of John Cronin's will (which she had expected to find given

John Cronin's pre-death request that she be the executor of his estate and his informing her that

he had had multiple discussions with attorneys and a tax accountant regarding his financial

matters). The Pro Se Debtor-Party In Interest was also unable to find any bank statements.

21.      The Pro Se Debtor-Party In Interest asked M.T. Johnsson if M.T. Johnsson had

seen a will or any bank statements when M.T. Johnsson was "cleaning" the studio condominium.

M.T. Johnsson informed the Pro Se Debtor-Party In Interest that M.T. Johnsson had found a coin

collection of John Cronin's that M.T. Johnsson had removed from the studio condominium, but

that M.T. Johnsson had not found a will or bank statements. Therefore, the Pro Se Debtor-Party

In Interest waited for John Cronin's incoming mail to determine where John Cronin had

checking accounts and other investments. Fortunately, the timing of John Cronin's death worked

well, as the January, 2012 and February, 2012 mail John Cronin received included annual

statements from his checking accounts and a few investments. To date, the Pro Se Debtor-Party

In Interest has not found a will or a life insurance policy taken out by John Cronin – both of

which she expected to find, given pre-death conversations she'd had with John Cronin.

22.      During the time the Pro Se Debtor-Party In Interest was trying to handle the

matter of finding John Cronin's will and/or discovering what assets John Cronin had left behind,

the Pro Se Debtor-Party In Interest was also in the midst of a highly contested, 15-month long

custody trial, as the bankruptcy estate had lifted the automatic stay to allow the Pro Se Debtor-

Party In Interest's then estranged husband and his lawyers to proceed with the custody trial, even

though the Pro Se Debtor-Party In Interest was never awarded any monies for any legal

representation in the custody trial and/or in her bankruptcy case from either the U.S. Bankruptcy

Court or the Domestic Relations Court[1]. During the months immediately following the death of

John Cronin, the Pro Se Debtor-Party In Interest's then estranged husband also arbitrarily ceased

making the monthly temporary support payments he had been court-ordered to pay to the Pro Se

Debtor-Party In Interest. These circumstances left the Pro Se Debtor-Party In Interest with no

monetary or time resources to conduct formal discovery to determine the existence of a will, the

existence of a life insurance policy and/or to conduct any formal discovery, whatsoever, related

to the estate of John Cronin, as she had to scramble to find a way to earn income to keep paying

her living expenses and to keep paying for all of her court-related costs, while her estranged

husband was allowed by Ms. Steege (the outsourced, private bankruptcy trustee) and Domestic

Relations Court to spend an estimated $500,000 in bankruptcy estate assets for his own defense

in the custody trial and in the Pro Se Debtor-Party In Interest's bankruptcy case proceedings.

23.     While M.T. Johnsson refused to help with the clearing out of John Cronin's studio

condominium, (beyond M.T. Johnsson's first post-death visit to John Cronin's condominium),

and M.T. Johnsson refused to contribute any monies to the resolution of John Cronin's estate, the

Pro Se Debtor-Party In Interest moved whatever financial records she could find to her own

residence and D.J. Johnsson worked nights and weekends moving all other items from John

Cronin's studio condominium to D.J. Johnsson's own residence. During this several month

---

[1] Domestic Relations Court = Circuit Court of Cook County, Illinois, County Department, Domestic Relations
Division.

period, D.J. Johnsson was paying the monthly condominium association dues and the monthly

garage payments to house John Cronin's van, with no assistance from M.T. Johnsson or from the

Pro Se Debtor-Party In Interest.

24.     When the Pro Se Debtor-Party In Interest had all of the January and February,

2016 statements gathered, she took D.J. Johnsson to each location, wherein D.J. Johnsson would

show his I.D. and would receive a check, as John Cronin had listed D.J. Johnsson as the sole

beneficiary on most of his accounts.

25.     M.T. Johnsson had been very non-cooperative in the process of identifying John

Cronin's assets and stated that she did not think D.J. Johnsson should be getting all of the money.

The Pro Se Debtor-Party In Interest told M.T. Johnsson that the banks would not be giving the

money to D.J. Johnsson, outright, if the law didn't say the money should pass directly to John

Cronin's designated beneficiary(ies). M.T. Johnsson threatened to get a lawyer, and the Pro Se

Debtor-Party In Interest recommended that M.T. Johnsson should do that, so M.T. Johnsson

could quit thinking she was being cheated out of an inheritance she didn't have coming to her,

and could work with the Pro Se Debtor-Party In Interest and D.J. Johnsson to sell the van and the

studio condominium so that D.J. Johnsson did not have to keep paying the monthly assessment

and parking fee.

26.     Finally M.T. Johnsson agreed to cooperate with D.J. Johnsson and the Pro Se

Debtor-Party In Interest to sell the studio condominium and the 12-year old van. The owner of

the funeral home that had handled the funeral of John Cronin and the funeral of the parties'

mother two years earlier, recommended an attorney friend of his, Michael Roberts, to help the

parties handle the paperwork.

27.     Given M.T. Johnsson's unfounded suspicions that she was being cheated out of an inheritance, the Pro Se Debtor-Party In Interest had M.T. Johnsson's interview the lawyer, Michael Roberts. The Pro Se Debtor-Party In Interest also said that if M.T. Johnsson wasn't satisfied with Michael Roberts as the lawyer, M.T. Johnsson should select another attorney, but that they needed an attorney right away so that D.J. Johnsson did not have to keep paying the monthly association and parking garage fees. Eventually M.T. Johnsson set up a meeting for the three siblings to figure out how to sell the studio condominium and the 12-year old van, given the Pro Se Debtor-Party In Interest still had not found an official will, with Michael Roberts.

28.     In the piles of paperwork the Pro Se Debtor-Party In Interest had been going through, she had found a hand-written list in John Cronin's handwriting that showed he intended to leave the studio condominium, a certificate on deposit and his checking accounts to D.J. Johnsson. The hand-written list also indicated that John Cronin intended to leave the 12-year old van to M.T. Johnsson. At the meeting with Michael Roberts, all three siblings agreed that the hand-writing looked like John Cronin's handwriting. However the bottom right-hand corner of the paper list was torn and there was no signature on the list, so Michael Roberts said it was not a valid will and that the parties should fill out a Small Estate Affidavit in order to sell the van and to liquidate one checking account the Pro Se Debtor-Party In Interest had discovered when taking D.J. Johnsson to various locations to claim the funds associated with John Cronin's other accounts, all of which had listed D.J. Johnsson as the sole beneficiary.

29.     During the siblings' meeting with Michael Roberts, M.T. Johnsson sat in a far corner and kept complaining that she still thought she might need to "hire her own attorney," to which the Pro Se Debtor-Party In Interest had replied that the Pro Se Debtor-Party In Interest and

D.J. Johnsson had already agreed to work with whichever attorney M.T. Johnsson felt comfortable hiring, but that it didn't make sense to have more than one attorney involved.

30.    At the conclusion of the meeting, each of the three siblings wrote a $500.00 check to retain Michael Roberts to handle the sale of the studio condominium and van.

31.    Based upon paperwork drafted by Michael Roberts, the parties were able to sell the 12-year-old van. The Pro Se Debtor-Party In Interest and D.J. Johnsson took the van to Car Max and to the original dealer that had sold the van to John Cronin and received fairly similar offers to buy the van. M.T. Johnsson refused to come with the Pro Se Debtor-Party In Interest and D.J. Johnsson to obtain quotes and eventually sell the van, but fortunately due to the Small Estate Claim forms Michael Roberts had prepared, the dealer did agree to purchase the van and agreed to release checks made payable to D.J. Johnsson, M.T. Johnsson and to the Pro Se Debtor -Party In Interest, each in the amount of $2,333.00.

32.    Michael Roberts handled the sale of the studio condominium and distributed checks to each of the three siblings. The checks were not equal amounts, as the parties agreed to reimburse D.J. Johnsson for the funeral expenses and condominium association dues, garage fees and condominium property taxes D.J. Johnsson had paid for prior to the condominium sale. Additionally, John Cronin had owned some Prudential stocks and when those stocks were liquidated Prudential wrote the check only to D.J. Johnsson, but Michael Roberts said Prudential should not have written the check only to D.J. Johnsson and that D.J. Johnsson would have to reimburse M.T. Johnsson and the Pro Se Debtor-Party In Interest for "their rightful portion" of the Prudential stocks.

**COUNT I - M.T. Johnsson's Concealing of Bankruptcy Estate Assets**

33.     M.T. Johnsson was the last person in John Cronin's studio condominium prior to

John Cronin's death. M.T. Johnsson was also the first person to enter John Cronin's studio

condominium after John Cronin had been removed from the premises on December 16, 2011.

M.T. Johnsson was also the only heir who had anything to gain from the disappearance of John

Cronin's will, as John Cronin had informed the Pro Se Debtor-Party In Interest that D.J.

Johnsson was supposed to receive virtually all of the proceeds from John Cronin's estate and that

M.T. Johnsson would not be receiving any proceeds from John Cronin's estate. Furthermore, any

monies the Pro Se Debtor-Party In Interest might have received would have become property of

the Pro Se Debtor-Party In Interest's bankruptcy estate. However, by stealing and concealing

John Cronin's will, other key documents and actual assets, M.T. Johnsson was able to garner for

herself one-third of John Cronin's worldly assets, not passed directly to D.J. Johnsson as a

beneficiary, estimated to be in excess of Fifty Thousand dollars, $50,000.00.

34.     The Pro Se Debtor-Party In Interest has repeatedly asked M.T. Johnsson about the

coin collection M.T. Johnsson admitted removing from John Cronin's studio condominium, as

the Pro Se Debtor-Party In Interest knew the coin collection should be appraised and/or

liquidated and that it was another asset of John Cronin's that could not have a beneficiary listed,

so it would have to be split three ways between D.J. Johnsson, M.T. Johnsson and the Pro Se

Debtor-Party In Interest's bankruptcy estate, unless a will was found that specified to whom John

Cronin wished to leave the coin collection. The Pro Se Debtor-Party In Interest informed M.T.

Johnsson that failure to turn over the coin collection constituted fraud. M.T. Johnsson has

refused to turn over the coin collection or to even get an appraisal of the coin collection stating

that the coin collection should belong to M.T. Johnsson's children as that would be their only

memory of John Cronin.

35.     M.T. Johnsson also recently admitted via email to the Pro Se Debtor-Party In Interest that M.T. Johnsson removed documents from John Cronin's studio condominium that M.T. Johnsson believes represent additional assets that should be considered part of John Cronin's estate, wherein M.T. Johnsson stated in pertinent part, "I found the signed copies of these notes (receivable) while cleaning out his condo and still have them."

36.     M.T. Johnsson is committing fraud on the U.S. Bankruptcy Court and against the Pro Se Debtor-Party In Interest by concealing and refusing/failing to turnover assets and other documents, most likely including John Cronin's will, which are in M.T. Johnsson's possession and which M.T. Johnsson knows were assets/documents of John Cronin's prior to John Cronin's death, and which M.T. Johnsson wrongfully stole from John Cronin's studio condominium.

## COUNT II – M.T. Johnsson's Obstruction of the Pro Se Debtor-Party In Interest's Efforts To Obtain Bank Account Records To Find the Names of John Cronin's Attorney(s) and Tax Accountant(s)

37.     Despite the Pro Se Debtor-Party In Interest's verbal and written pleas to M.T. Johnsson to sign documents to authorize the banks where John Cronin had checking accounts to release to the Pro Se Debtor-Party In Interest copies of John Cronin's bank account statements including cancelled checks, so that the Pro Se Debtor-Party In Interest can determine whether or not any checks were written to a law firm or accountant so that the Pro Se Debtor-Party In Interest can officially resolve whether or not John Cronin left a will (as he informed the Pro Se Debtor-Party In Interest that he was intending to do), M.T. Johnsson has not only refused to sign any such documents but has also intentionally and harmfully confused D.J. Johnsson about the reasons why the Pro Se Debtor-Party In Interest needs access to these documents, wrongfully and harmfully alleging that the Pro Se Debtor-Party In Interest wants them to sign the documents in an attempt to get paid twice for the monies already disbursed by the banks to D.J. Johnsson.

38.     Whereas the Pro Se Debtor-Party In Interest has also informed both M.T. Johnsson and D.J. Johnsson that the Pro Se Debtor-Party In Interest needs to be able to prove to the U.S. Bankruptcy Court exactly what monies (if any) are due to the Pro Se Debtor-Party In Interest's bankruptcy estate related to the death of John Cronin, and that their refusal to sign documents authorizing the Pro Se Debtor-Party In Interest to have access to the bank account records constitutes a fraudulent obstruction that would force the Pro Se Debtor-Party In Interest to have to file an adversary complaint to obtain the rights to conduct the discovery necessary to resolve the questions surrounding the estate of John Cronin and to determine which assets/ monies (if any) are due to the Pro Se Debtor-Party In Interest's bankruptcy estate.

39.     M.T. Johnsson's email response to the Pro Se Debtor-Party In Interest's attempts to amicably resolve the matters outlined in paragraphs 37 and 38, above, was as follows, "I will not be bullied by you into signing fraudulent documents by your threats to file lawsuits against Don and I if we don't sign these fraudulent documents. Determination of assets and distribution of uncle johns estate was settled in 2012 by the attorney YOU HIRED, Mike Roberts."

40.     M.T. Johnsson is also intentionally and fraudulently using carefully tailored statements in email and in conversations with D.J. Johnsson to obstruct the Pro Se Debtor-Party In Interest from determining the amount of money actually owed to the Pro Se Debtor-Party In Interest's bankruptcy estate pursuant to the death of John Cronin by not agreeing to sign the documents necessary to authorize the banks where John Cronin had checking accounts to release bank statements and cancelled checks to the Pro Se Debtor-Party In Interest. Furthermore, M.T. Johnsson is carefully constructing her emails to only be sent from her iPhone and to contain no signature, in an ill-conceived attempt to make the electronic and paper trail look as if her correspondence may not have been authored by her.

12

**COUNT III – D.J. Johnsson's Obstruction of the Pro Se Debtor-Party In Interest's Efforts To Obtain Bank Account Records To Find the Names of John Cronin's Attorney(s) and Tax Accountant(s)**

41.     D.J. Johnsson never attended college, and works at the same bank he has worked at since he was a high school intern where he works in maintenance and earns less than $20,000 in net income on an annual basis. D.J. Johnsson is financially unsophisticated. When D.J. Johnsson was on the witness stand in the trial related to Ms. Steege's adversary complaint #14-A-00106, D.J. Johnsson did not even know that he had been a beneficiary named on John Cronin's accounts and that is why he received over $100,000 in monies related to John Cronin's death, not counting the funds D.J. Johnsson received related to the sale of John Cronin's studio condominium. D.J. Johnsson is also technologically unsophisticated, having never owned a computer, having never had an email account, and having never used the internet.

42.     D.J. Johnsson also admitted when he was on the witness stand in the trial related to Ms. Steege's adversary complaint #14-A-00106 that he has only twice been in a lawyer's office in his entire life – once for the meeting with Michael Roberts (see paragraphs 27 through 29 above), and once related to Ms. Steege's adversary complaint #14-A-00106 which wrongfully and harmfully sought to lay the groundwork to force a sale of D.J. Johnsson's house to pay for Ms. Steege's law firm's outrageous several hundred thousand dollar 'fees' Ms. Steege seeks to charge to the Pro Se Debtor-Party In Interest's bankruptcy estate, where bankruptcy estate creditors are owed only $149,504.06 and wherein Ms. Steege granted to the Pro Se Debtor-Party In Interest's ex-husband over $10 million in bankruptcy estate assets and income in exchange for the lump sum of $120,000.

43.     D.J. Johnsson has informed the Pro Se Debtor-Party In Interest that he will not sign the documents the Pro Se Debtor-Party In Interest requested that he sign to authorize the

banks where John Cronin had his checking accounts to release bank statements and cancelled

checks to the Pro Se Debtor-Party In Interest because M.T. Johnsson told him that the

documents were fraudulent and that the Pro Se Debtor-Party In Interest was trying to collect

monies from the banks that had already been paid to the siblings.

44.    D.J. Johnsson also told the Pro Se Debtor-Party In Interest that he is afraid that "if

he says anything about this case he is afraid he will go to jail." D.J. Johnsson admitted on the

witness stand related to Ms. Steege's adversary complaint #14-A-00106 that his lawyer "has

sworn him to secrecy about this case," and told him not to discuss it with anyone.

45.    D.J. Johnsson is committing fraud on the U.S. Bankruptcy Court and against the

Pro Se Debtor-Party In Interest by failing to disclose whatever he knows about M.T. Johnsson's

fraudulent actions related to M.T. Johnsson's removal of assets, and M.T. Johnsson's removal of

John Cronin's will and/or other documents from John Cronin's studio condominium, which may

rightfully belong to the Pro Se Debtor-Party In Interest's bankruptcy estate, and/or even may

rightfully belong to D.J. Johnsson.

46.    D.J. Johnsson is also fraudulently and intentionally obstructing the Pro Se Debtor-

Party In Interest from determining the amount of money actually owed to the Pro Se Debtor-

Party In Interest's bankruptcy estate pursuant to the death of John Cronin by not agreeing to sign

the documents necessary to authorize the banks where John Cronin had checking accounts to

release bank statements and cancelled checks to the Pro Se Debtor-Party In Interest.

## COUNT IV – Michael Roberts Aiding of M.T. Johnsson's Frauds

47.    The Pro Se Debtor-Party In Interest was told by a third-party that Michael Roberts

was actually hired by M.T. Johnsson on a contingency basis to collect as much money as

possible on M.T. Johnsson's behalf related to the deaths of the siblings' mother (died in October,

2009) and of their uncle, John Cronin (died in December, 2011). This revelation finally clarified

for the Pro Se Debtor-Party In Interest why M.T. Johnsson had made such a big fuss in Michael

Roberts' office stating that M.T. Johnsson was still considering hiring "her own attorney," to

which the Pro Se Debtor-Party In Interest had replied that the Pro Se Debtor-Party In Interest

would work with whichever attorney M.T. Johnsson wanted to hire, but that it didn't make sense

to have more than one attorney involved. M.T. Johnsson's drama was just an act to conceal the

fact that Michael Roberts was already M.T. Johnsson's attorney working on a contingency basis

to obtain monies for M.T. Johnsson that rightfully belonged to D.J. Johnsson.

48.    Michael Roberts failed to disclose to the Pro Se Debtor-Party In Interest his

contingency-basis attorney relationship with M.T. Johnsson. To the best of the Pro Se Debtor-

Party In Interest's knowledge, Michael Roberts also failed to disclose his relationship with M.T.

Johnsson to D.J. Johnsson. Wherefore, Michael Roberts fraudulently concealed his attorney-

client relationship with M.T. Johnsson when he requested that D.J. Johnsson and the Pro Se

Debtor-Party In Interest hire him to sell John Cronin's studio condominium and van.

49.    Upon information and belief, Michael Roberts has knowledge that M.T. Johnsson

wrongfully removed and is concealing John Cronin's will and/or other documents of John

Cronin's. Despite Michael Roberts' position as an attorney and officer of the court, Michael

Roberts has failed to disclose M.T. Johnsson's fraudulent actions to the U.S. Bankruptcy Court

or to Ms. Catherine L. Steege, when she questioned him about the matters related to the death of

John Cronin. Therefore, due to Michael Roberts' actions and failure to disclose the fraudulent

actions of M.T. Johnsson, Michael Roberts has committed fraud on the Court, has committed

fraud against D.J. Johnsson and has also committed fraud against the Pro Se Debtor-Party In

Interest and against her bankruptcy estate.

## COUNT V – Michael Roberts' Attempted Fraud on U.S. Bankruptcy Court

50.     Michael Roberts misspelled the Pro Se Debtor-Party In Interest's name on the check he had issued to the Pro Se Debtor-Party In Interest related to the sale of John Cronin's studio condominium. When the Pro Se Debtor-Party In Interest called Michael Roberts to ask him to fix the check, Michael Roberts told her he was intentionally misspelling the Pro Se Debtor-Party In Interest's name because she was in the midst of bankruptcy proceedings. This action of Michael Roberts was an attempted fraud on the U.S. Bankruptcy Court that the Pro Se Debtor-Party In Interest prevented from occurring, as the Pro Se Debtor-Party In Interest told Michael Roberts that she was not hiding anything from the U.S. Bankruptcy Court and that she was actually expected to receive a multi-million dollar Debtor's surplus from the proceedings.

## COUNT VI – Michael Roberts' Fraud On D.J. Johnsson

51.     Michael Roberts intentionally and fraudulently overrode the distribution of the Prudential stock, which liquidation check was made out solely to D.J. Johnsson by Prudential in accordance with their records, and instead insisted that the monies be split between D.J. Johnsson, M.T. Johnsson and the Pro Se Debtor-Party In Interest when Michael Roberts directed and facilitated the drafting of checks to each of the siblings pursuant to the sale of John Cronin's studio condominium, for the wrongful benefit of M.T. Johnsson and of Michael Roberts' contingency fees.

## Reliance, Consequences and Damages

52.     Whereas, the Pro Se Debtor-Party In Interest trusted her sister, M.T. Johnsson to be in John Cronin's studio condominium, unsupervised, and never thought that M.T. Johnsson would intentionally and fraudulently steal and conceal John Cronin's will, other documents (such

as the missing life insurance policy and notes receivable) and assets (such as the coin collection). In fact, quite the opposite was true in that the Pro Se Debtor-Party In Interest relied upon the false representations of M.T. Johnsson, D.J. Johnsson and Michael Roberts in trying to accommodate John Cronin's wishes for the orderly distribution of his estate assets and affairs.

53.    M.T. Johnsson is a highly successful advertising media executive who negotiates media buying contracts for some of the largest corporations with the top television, radio, cable, internet and other advertising media on a daily basis. The Pro Se Debtor-Party In Interest expected M.T. Johnsson's assistance and relied upon M.T. Johnsson's fraudulent misrepresentations in the Pro Se Debtor-Party In Interest's handling of the affairs related to John Cronin's death and in making sure that John Cronin's wishes to ensure a financially secure future for their brother, D.J. Johnsson was indeed accomplished.

54.    The Pro Se Debtor-Party In Interest relied upon M.T. Johnsson's intentionally fraudulent misrepresentations that there was no will of John Cronin's nor copies of any bank statements in John Cronin's studio condominium and has spent a significant amount of time over the past four and a half years trying to work around the missing will to achieve John Cronin's stated intent of transferring his worldly assets to D.J. Johnsson.

55.    Furthermore, the Pro Se Debtor-Party In Interest has incurred thousands of dollars in direct costs related to her legal defense in adversary complaint #14-A-00106 and in the filing and prosecution of this adversary complaint, which all could have been avoided were it not for the fraudulent actions, fraudulent misrepresentations and intentional obstruction of the Pro Se Debtor-Party In Interest's efforts to obtain the bank documents required to definitively resolve these matters committed by M.T. Johnsson, D.J. Johnsson and Michael Roberts.

56.    The consequences of M.T. Johnsson's fraudulent actions (removal and concealment of John Cronin's will, key documents and actual assets) from John Cronin's studio condominium and the constructive fraud in the form of outright prevention/obstruction of the Pro Se Debtor-Party In Interest's attempts to obtain bank statements and cancelled checks by M.T. Johnsson and D.J. Johnsson, and the constructive fraud/cover-up/failure to report M.T. Johnsson's fraudulent actions by D.J. Johnsson and Michael Roberts are much greater than just the loss of time, in that M.T. Johnsson's fraudulent actions have caused Catherine L. Steege (the outsourced, private bankruptcy trustee) to wrongfully accuse the Pro Se Debtor-Party In Interest of fraud related to the unresolved status of John Cronin's estate, which wrongful fraud allegations have made it virtually impossible for the Pro Se Debtor-Party In Interest to work in the industry she was trained to work in – the accounting and finance industry, where the Pro Se Debtor-Party In Interest was once one of the top 150 women in finance in the Chicago and New York areas, and wherefrom the Pro Se Debtor-Party In Interest once used to draw income in excess of $500,000 to $1 million on an annual basis.

57.    Furthermore, there are most likely direct financial damages caused by M.T. Johnsson's fraudulent actions in that there may indeed be monies due to the Pro Se Debtor-Party In Interest and/or to the Pro Se Debtor-Party In Interest's bankruptcy estate, which damages can not be accurately estimated until discovery is conducted in this matter, including the discovery of John Cronin's missing will and missing life insurance policy. However, it is already clear that M.T. Johnsson has taken over Fifty Thousand dollars from John Cronin's estate that did not belong to her, which most likely belong to D.J. Johnsson, but may also be due to the Pro Se Debtor-Party In Interest and/or her bankruptcy estate, and which may even include deferred gifts or some other tax-advantaged asset distribution plan created by John Cronin's tax accountant.

**WHEREFORE,** for the foregoing reasons, Margaret Ann Johnsson, the Pro Se Debtor and Party In Interest prays this Honorable Court will enter a judgment order which reverses the fraudulent transfer of John Cronin's worldly assets to M.T. Johnsson, orders M.T. Johnsson, D.J. Johnsson and Michael Roberts to pay equitable and just damages to the Pro Se Debtor-Party In Interest including but not limited to loss of income and reimbursement of litigation expenses in this adversary complaint and in adversary complaint #14-A-00106, and for such other relief as this Court deems just.

Dated  March 25, 2016

Margaret Ann Johnsson, Pro Se
534 W. Dickens, Chicago, IL 60614

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE: MARGARET ANN JOHNSSON    )

                )     Chapter 7

    Pro Se Debtor and Party in Interest  )

                )     Case No. 11-B-38307

_____  )

                )     Honorable Timothy A. Barnes

MARGARET ANN JOHNSSON     )

    Plaintiff            )     Adversary Proc. No. 16-A-\_\_\_\_\_

      v.             )

MARY THERESE JOHNSSON,    )

DONALD JOSEPH JOHNSSON, and  )

MICHAEL ROBERTS        

    Defendants         )

## NOTICE OF ADVERSARY COMPLAINT

    PLEASE TAKE NOTICE that on *April 7, 2016* at *9:30* a.m., I shall appear before the Honorable Timothy A. Barnes or any other judge sitting in his stead in Courtroom 744, 219 S. Dearborn Street, Chicago, IL 60604, and there and then present my Pro Se Debtor-Party In Interest's/Plaintiff's Adversary Complaint #_____, a true copy of which is hereby served upon you.

March 25, 2016

                     MARGARET ANN JOHNSSON

                     Margaret Ann Johnsson, Pro Se

                     534 W. Dickens, Chicago, IL 60614

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

MAR 25 2016

JEFFREY P. ALLSTEADT, CLERK

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on March 25, 2016, I filed the foregoing documents, Pro Se

Debtor-Party In Interest's/Plaintiff's Adversary Complaint #_____ and the

accompanying Notice of Adversary Complaint, with the Clerk of the U. S. Bankruptcy Court. I

also certify that the foregoing documents are being served this day by in-person and/or U.S.

Postal Service, as indicated, to the parties listed below:

Via U.S.P.S.

Catherine Steege, ESQ
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654

Via In-Person Delivery

Patrick S. Layng
Office of the U.S. Trustee, Region 11
219 S. Dearborn – Room 873
Chicago, IL 60604

Via U.S.P.S.

Mary Therese Johnsson
419 W. Belden – Unit #2
Chicago, IL 60614

Via U.S.P.S.

Donald Joseph Johnsson
3744 N. Richmond
Chicago, IL 60618

Via U.S.P.S.

Michael Roberts, ESQ
205 W. Wacker Drive – Suite 515
Chicago, IL 60606

By: _____
Margaret Ann Johnsson, Pro Se
534 W. Dickens, Chicago, IL 60614

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>*Margaret Ann Johnson* | DEFENDANTS<br>*Mary Therese Johnson*<br>*Donald Joseph Johnson*<br>*Michael Roberts* |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>*534 W Dickens*<br>*Chicago IL 60614* | ATTORNEYS (If Known) |
| PARTY (Check One Box Only)<br>☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☒ Other<br>☐ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

*Fraud*

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
MAR 25 2016
JEFFREY P. ALLSTEADT, CLERK

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☒ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☒ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR *Margaret Ann Johnson* | BANKRUPTCY CASE NO. *11-B-38307* |
| DISTRICT IN WHICH CASE IS PENDING *Northern District IL* | DIVISION OFFICE *Northern District IL*  NAME OF JUDGE *Barnes* |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF ~~Margaret Ann Johnson~~ *Catherine L. Steege* | DEFENDANT *Margaret Ann Johnson* | ADVERSARY PROCEEDING NO. *14-A-00106* |
| DISTRICT IN WHICH ADVERSARY IS PENDING *Northern District IL* | DIVISION OFFICE | NAME OF JUDGE *Barnes* |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|
| *[signature]* |

| DATE *3/25/16* | PRINT NAME OF ATTORNEY (OR PLAINTIFF) *Margaret Ann Johnson* |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.